UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| JAMES R. BLANKENSHIP, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | No. 2:17-cv-00018 |
| v. | ) | CHIEF JUDGE CRENSHAW |
| | ) | |
| CITY OF CROSSVILLE, TENNESSEE, | ) | |
| a Municipal Corporation; JESSE | ) | |
| KERLEY and IVY GARDNER | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Pending before the Court is the fully briefed "Motion for Judgment on the Pleadings on Behalf of Ivy Gardner" (Doc. No. 21). By way of that Motion, Gardner, who is a Municipal Court Judge in Crossville, Tennessee, seeks judgment on James R. Blankenship's 42 U.S.C. § 1983 claims on the grounds of absolute immunity. She also seeks dismissal of Blankenship's 42 U.S.C. § 1985(3) claim because it fails to state a claim upon which relief can be granted. Finally, she argues that portions of Blankenship's request for injunctive and declaratory relief fail. For the reasons that follow, Gardner's Motion will be granted in part and denied in part.

**I. Standards of Review**

Motions for Judgment on the Pleadings are governed by Rule 12(c) of the Federal Rules of Civil Procedure and are analyzed the same as Motions to Dismiss for failure to state a claim under Rule 12(b)(6). Jackson v. Prof'l Radiology Inc., 864 F.3d 463, 466 (6th Cir. 2017). In ruling on such motions, "a district court must construe the complaint in the light most favorable to the plaintiff, accept all of the complaint's factual allegations as true, and determine whether the plaintiff

1

undoubtedly can prove no set of facts in support of his claim that would entitle him to relief.'" Engler v. Arnold, 862 F.3d 571, 574–75 (6th Cir. 2017) (quoting Kottmyer v. Maas, 436 F.3d 684, 689 (6th Cir. 2006)). To survive either a 12(b)(6) or 12(c) motion, the 'complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Id. at 575 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "Mere labels and conclusions are not enough; the allegations must contain 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Id.

## II. Section 1983 Claim and Absolute Immunity

The Complaint contains sufficient allegations to support his Section 1983 claim against Gardner, notwithstanding the "well-entrenched principle in our system of jurisprudence that judges are generally absolutely immune from civil suits for money damages." Bright v. Gallia Cty., 753 F.3d 639, 648 (6th Cir. 2014) (citation omitted). "[T]his immunity ... is not for the protection or benefit of a malicious or corrupt judge, but for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences." Id. (quoting Pierson v. Ray, 386 U.S. 547, 554 (1967)). Because of the strong policy considerations underlying the doctrine, judicial "immunity is overcome in only two sets of circumstances. First, a judge is not immune from liability for nonjudicial actions, i.e., actions not taken in the judge's judicial capacity. . . . Second, a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction." Mireles v. Waco, 502 U.S. 9, 11–12 (1991).

Here, accepting the Complaint's allegations as true, Gardner may be liable under the theory that she took non-judicial actions for personal reasons that deprived Blankenship of his

2

constitutional rights. Specifically, the Complaint alleges that, after the Crossville City Council repeatedly ignored Blankenship's complaints about mistreatment by the Crossville police, he distributed flyers under the "*nom de plume* 'Sam.'" (Doc. No. 1 Complaint, Exh. A). The flyers offered a $500 reward for photographs of elected or appointed Crossville officials "doing wrong," with the list of "wrongs" ranging from wearing no seat belt, to corruption. (Id.). This distribution resulted in Blankenship being cited for violation of a city ordinance that makes it illegal to circulate unsigned literature.

Blankenship asserts that the police cited him for the ordinance violation at the behest of Councilman Jesse Kerley who harbored a grudge because Blankenship sought to speak out at council meetings about his alleged mistreatment by Crossville officers. (Id. ¶ 23). Blankenship further alleges that, while the Ordinance violation was awaiting hearing in the Municipal Court, Gardner, prompted by Kerley, sought and received an *ex parte* restraining order against him from a General Sessions Judge. At the time the restraining order was issued, Blankenship claims, he "did not know and to his knowledge had never seen or met" Judge Gardner. (Id. ¶ 31). The upshot of Blankenship's claims against Gardner is that she and Kerley conspired to retaliate against him for the exercise of his rights to free speech and free press under the First Amendment, and that they sought to intimidate him from further exercising those rights.

In her Motion, Gardner argues Blankenship has the time-line wrong. Contrary to his allegations, the hearing on the ordinance violation occurred on May 10, 2016, weeks before Gardner appeared in the General Sessions Court on June 16, 2016. In support of this time-line, she attached to her Motion records from the Municipal Court Clerk, including (1) a "Criminal Counter Claim" filed by Blankenship on May 14, 2016 that sought compensatory and punitive damages in the

amount of $666,666,666.66; (2) an appeal bond executed by Blankenship, and an affidavit of indigency both dated May 10, 2016; (3) a Request for Findings of Fact and Conclusions of Law dated May 11, 2016; and (4) an undated Motion to Stay Judgment Pending Appeal. (Doc. No. 24). Further, Gardner submitted with her reply several other documents from the Municipal Court, including (1) an appeal bond dated May 17, 2016; (2) a subpoena filed July 1, 2016 directing a Crossville Police officer to appear before the Circuit Court on August 29, 2015; and (3) a June 27, 2016 Motion to Stay Judgment Appeal. (Doc. No. 30).

As suggested at the outset, in ruling on a motion for judgment on the pleadings, a court's "decision rests primarily upon the allegations of the complaint." Barany-Snyder v. Weiner, 539 F.3d 327, 332 (6th Cir. 2008). However, "'matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint[ ] also may be taken into account.'" Id. (citation omitted). Indeed, "[a] court is not bound to accept either (1) unwarranted inferences, including allegedly inferable 'facts' or conclusions which contradict documentary evidence appended to, or referenced within, the plaintiff's complaint; or (2) alleged legal conclusions." Mulbarger v. Royal All. Assocs., Inc., 10 F. App'x 333, 335 (6th Cir. 2001); see Williams v. CitiMortgage, Inc., 498 F. App'x 532, 536 (6th Cir. 2012) (observing that "if a factual assertion in the pleadings is inconsistent with a document attached for support, the Court is to accept the facts as stated in the attached document").

The documents that Gardner has filed seem to show that the hearing on the alleged Ordinance violation occurred sometime around May 10, 2016, just as she claims. Absent any context, however, those documents are not definitive, as none of the documents establishes when Blankenship actually appeared before Gardner for a hearing. Moreover, while the Complaint is not

4

verified, Blankenship attached an affidavit thereto in which he avers that the allegations in the Complaint are "based upon his personal knowledge," and "upon the good faith belief that they are truthful and have a factual basis." (Doc. No. 1-1 Aff. ¶¶ 3, 4). The Court need not (and cannot) resolve the apparent discrepancy in the hearing date on this record. No matter: even if Gardner is correct and the hearing occurred before she sought a restraining order, it does not follow, perforce, that she is entitled to judicial immunity.

In support of her Motion, Gardner relies upon several Sixth Circuit decisions standing for the proposition that judicial immunity extends to actions taken to protect the integrity of the judicial office the judge holds. By way of examples, judicial immunity was found to attach in <u>Barnes v. Winchell</u>, 105 F. 3d 1111 (6th Cir. 1997), where a judge (1) told the prosecutor to up the charges against defendants from criminal trespass to menace by stalking; (2) notarized the criminal complaints and/or assisted in their preparation; and (3) maliciously refused to dismiss the complaints after the prosecutor determined they were frivolous; in <u>Barrett v. Harrington</u>, 130 F.3d 246 (6th Cir. 1997), where the judge wrote letters that resulted in the investigation of a disgruntled litigant who had appeared before her; and in <u>Brookings v. Clunk</u>, 389 F.3d 614 (6th Cir. 2004), where a probate judge brought criminal charges against a litigant who lied about his gender status in applications for marriage licenses. While such cases generally support Gardner's position, they should not be applied too broadly, particularly where, as here, the facts are wholly underdeveloped.

In <u>Barnes</u>, the Sixth Circuit recognized that, even though the judicial immunity "doctrine has protected a sweeping range of judicial actions," when "an action taken by a judge is not an adjudication between the parties, it is less likely that the action will be deemed judicial." <u>Barnes</u>, 105 F.3d at 1116. In other words, "despite its breadth, the doctrine of absolute judicial immunity

does not protect a judge performing the purely prosecutorial functions involved in initiating criminal prosecutions. This is especially true where the judge initiates criminal prosecutions based on the judge's private interests, completely separate from cases brought to court independently by the parties." Id. at 1118. Here, at least according to the Complaint, the action Gardner took was for her own personal reasons and/or in conjunction with some sort of vendetta Kerley had against Blankenship.

Barrett is more on point factually because it involved "acts performed outside of the courtroom, [which] are not, *ipso facto*, non-judicial acts." 130 F.3d at 260. Just as it had in Barnes, however, the Sixth Circuit in Barrett made clear that judicial immunity is employed "quite sparing[ly]" and should not be extended "'further than its justification would warrant.'" Id. at 254 (quoting Burns v. Reed, 500 U.S. 478, 486 (1991)). Nevertheless, immunity was warranted in that case because the judge's instigation of a criminal investigation was specifically taken to protect the integrity of the judicial system. In fact, in complaining to federal and state prosecutors, the judge sent letters on her official stationary stating that the plaintiff was "*attempting to obstruct justice by harassing me and my family*," with "the purpose of the harassment [being] to create circumstances that would appear to require me to recuse myself from cases enforcing [codes] against him." Id. at 259 (emphasis in original). In finding summary judgment warranted, the Sixth Circuit observed:

> Just as a judge's citation for contempt against a party who obstructs justice is a judicial act taken to preserve integrity of the judicial system, so too is the instigation of criminal proceedings against a disgruntled litigant whose conduct may amount to obstruction. It would make little sense, and only promote form over substance, for us to say that a judge's response in redressing threatening conduct which she physically observes (e.g., contempt) is entitled to the cloak of judicial immunity, but her action in redressing a threat arising in reaction to her adjudicatory actions which she is told of by others is not entitled to the same level of immunity. The import is in the nexus between the Judge's action which gave rise to the threat and her response to the threat, not simply the response itself.

Id. at 259 (footnote omitted).

Here, Judge Gardner may have sought a temporary restraining order precisely because she felt threatened as a result of the decision she made (or would make) in relation to the alleged ordinance violation. This would entitled her to the cloak of judicial immunity as Barrett makes clear. However, this is far from an established fact, particularly when one considers that, in seeking a restraining order, Gardner specifically did not mention her role as a judge, a hearing, or that she felt threatened because of a judicial decision she made. Rather, she claimed that Blankenship had confronted her "using various outlets repeatedly in an effort to harass and alarm," and that he had "engaged in a pattern of conduct to harass and unnecessarily alarm." (Doc. No. 1-5 at 1).

Finally, in Brookings, the Sixth Circuit relied heavily on both Barrett and Barnes in concluding that the probate judge was entitled to judicial immunity. Although it was a "close question," the court found that the judge's actions were taken to "preserve the integrity of the judicial system" because plaintiff "had a committed a crime in his court," and had "attempted to obstruct justice in a case then pending before" the judge. Brookings, 389 F.3d at 617, 622. Again, whether Gardner's request for a temporary restraining order was to preserve the integrity of her court or was done for personal reasons is not something that can be decided solely on the pleadings before the Court.

The Court recognizes that "judicial immunity is immunity not just from the ultimate assessment of damages but is immunity from suit itself," King v. McCree, 573 F. App'x 430, 438 (6th Cir. 2014), and, therefore, "courts have generally held that such immunity be determined early in a proceeding." Doe v. Univ. of Kentucky, 860 F.3d 365, 372 (6th Cir. 2017). Nevertheless, "'[t]he proponent of a claim to absolute immunity[,] bears the burden of establishing the justification

7

for such immunity," Antoine v. Byers & Anderson, Inc., 508 U.S. 429, 432 (1993), and Gardner has not carried that burden as of yet.

### III. Section 1985(3) Claim and Discriminatory Animus

So far as relevant, Section 1985(3) provides:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3). The elements of such a claim are "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities of the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." Vakilian v. Shaw, 335 F.3d 509, 518 (6th Cir. 2003) (citing United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott, 463 U.S. 825, 828–29 (1983)). Further, because Section 1985(5) provides a federal cause of action against persons who conspire to deprive an individual of "equal protection of the laws" or of "equal privileges and immunities under the laws," the Sixth Circuit has repeatedly held that a plaintiff must also "allege that the conspiracy was motivated by racial, or other class-based, invidiously discriminatory animus." Moniz v. Cox, 512 F. App'x 495, 499–500 (6th Cir. 2013) (collecting cases). Thus, "[t]o sustain a claim under section 1985(3), a claimant must prove both membership in a protected class and discrimination on account of it." Smithers *ex rel.* Norris v. City of Flint, 602 F.3d 758, 765 (6th Cir. 2010).

8

Blankenship does not claim racial animus or membership in a protected class as a basis for his Section 1985(3) claim. Instead, he relies almost entirely on Conklin v. Lovely, 834 F.2d 543 (1987) wherein the Sixth Circuit affirmed a jury award under Section 1985(3) in favor of a county employee who had been dismissed because of her political views, and her support for a candidate that ran against defendants. Reliance on Conklin is misplaced.

Conklin was a bit of an outlier at the time it was written because, as the Sixth Circuit acknowledged, "other circuits . . . ha[d] restricted section 1985(3) to conspiracies directed toward racial classes." 834 F.2d at 49. Nevertheless, and even though "whether section 1985(3) was intended to reach anything other than racial animus present[ed] a 'close question,'" the Sixth Circuit was "not writing on a clean slate." Id. Instead, the court was bound by its earlier decision in Cameron v. Brock, 473 F.2d 608, 610 (6th Cir. 1973), which held that "§ 1985(3)'s protection reaches clearly defined classes, such as supporters of a political candidate."

This Court, in turn, is bound by both Conklin and Cameron, but it does not follow that Blankenship has stated a viable claim under Section 1985(3). He makes no allegations that he was subjected to retaliation because of his support for a political candidate, or that he was a member of a clearly defined class, political or otherwise. His allegations about "political" activity are limited to his distribution of flyers seeking the goods on Crossville public officials (regardless of their affiliation), and the fact that he was not called on to speak at city council meetings.

Moreover, the Sixth Circuit in Conklin relied heavily on United Bhd of Carpenters, Local 610 v. Scott, 436 U.S. 825, 829 (1983), which quoted Griffin v. Brekenridge, 403 U.S. 88, 91 (1971), for the principle that a claim under Section 1985(3) could be "motivated by some racial or perhaps otherwise class-based invidiously discriminatory animus behind the conspiracy." However,

9

after Conklin was decided, the Supreme Court observed that "we have not yet had occasion to resolve the 'perhaps'; only in Griffin itself have we addressed and upheld a claim under § 1985(3), and that case involved race discrimination." Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 269 (1993). The Court continued:

> Whatever may be the precise meaning of a "class" for purposes of Griffin's speculative extension of § 1985(3) beyond race, the term unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors. Otherwise, innumerable tort plaintiffs would be able to assert causes of action under § 1985(3) by simply defining the aggrieved class as those seeking to engage in the activity the defendant has interfered with. This definitional ploy would convert the statute into the "general federal tort law" it was the very purpose of the animus requirement to avoid.

Id.

The Complaint contains no allegation about a group of individuals that shares Blankenship's desire to engage in the same sort of conduct, let alone that the amorphous group was subjected to discriminatory animus because of their desire. Even if Blankenship were deemed a "class of one," he has not alleged "entitle[ment] to the kind of special protection" afforded by Section 1985(3) required for such a class. Royal Oak Entm't, LLC v. City of Royal Oak, 205 F. App'x 389, 399 (6th Cir. 2006); see McGee v. Schoolcraft Cmty. Coll., 167 F. App'x 429, 435 (6th Cir. 2006) (citation omitted) ("The Sixth Circuit has ruled that § 1985(3) only applies to discrimination based on race or membership in a class which is one of those so-called 'discrete and insular' minorities that receive special protection under the Equal Protection Clause because of inherent personal characteristics."). Accordingly, Blankenship's Section 1985(3) claim will be dismissed.

## IV. Injunctive and Declaratory Relief

Gardner seeks judgment on Blankenship's request for injunctive relief "because such relief is not available . . . since she was acting in her judicial capacity." (Doc. No. 22 at 24). As already

10

noted, however, the determination of whether Gardner was acting in her judicial capacity cannot be determined on the pleadings and is something that needs to be fleshed out in discovery.

In addition to an injunction, Blankenship requests "declaratory . . . relief to declare the earlier actions illegal and enjoin Defendants and their agents from otherwise retaliating him for exercising his First Amendment rights either by arresting him or threatening to arrest him and specifically so that he might publish fliers and circular [sic] them in Crossville, even if critical of public officials." (Doc. No. 1, Complaint ¶103). Gardner seeks judgment on this request because a "declaratory judgment claim . . . is actionable only to the extent it seeks prospective relief." (Doc. No. 22 at 25, quoting Ward v. City of Norwalk, 640 F. App'x 462, 468 (6h Cir. 2016)).

For purposes of declaratory relief, "past exposure to alleged illegal conduct does not establish a present live controversy if unaccompanied by any continuing present effect," Utah Animal Rights Coal. v. Salt Lake City Corp., 371 F.3d 1248, 1263 (10th Cir. 2004), and, "[w]ith limited exceptions, . . . issuance of a declaratory judgment deeming past conduct illegal is also not permissible as it would be merely advisory," Am. Civil Liberties Union of Mass. v. U.S. Conference of Catholic Bishops, 705 F.3d 44, 53 (1st Cir.2013). This is because federal courts "are not in the business of pronouncing that past actions which have no demonstrable continuing effect were right or wrong." Spencer v. Kemna, 523 U.S. 1, 18 (1998)). Still, a party "may retain an interest in obtaining a declaratory judgment if the challenged conduct is capable of repetition yet evading review," In re City of Detroit, 841 F.3d 684, 691 (6th Cir. 2016), and "declaratory relief is available . . . when a live controversy continues to exist," Ward, 640 F. App'x at 468.

Whether to grant declaratory relief is a matter of discretion, the exercise of which partly depends on a determination of whether the declaration "would serve a useful purpose in clarifying

the legal relations at issue." Found. for Interior Design Educ. Research v. Savannah Coll. of Art & Design, 244 F.3d 521, 526 (6th Cir. 2001). For two reasons, the Court will not exercise that discretion at this point in the proceedings.

First, the Complaint must be construed most favorably in favor of Blankenship, and it can be read to suggest that his request for declaratory relief is based upon prior acts that are part-and-parcel of Kerley's and Gardner's continuing actions to curtail his right to free speech. Second, it may become unnecessary to address the request for declaratory relief against Gardner should discovery show that she sought a restraining order to address Blankenship's attempt to obstruct justice and/or to maintain the integrity of her court.

## IV. Conclusion

For the foregoing reasons, Gardner's Motion for Judgment on the Pleadings will be granted in part and denied in part. The Motion will be granted with respect to Blankenship's claim under Section 1985(3), but in all other respects denied.

An approrpriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE